**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

**CRIMINAL ACTION NO. 23-26-DLB-CJS**

**UNITED STATES OF AMERICA**                                              **PLAINTIFF**


**V.**         **RESPONSE OF THE UNITED STATES IN OPPOSITION**
              **TO DEFENDANT'S MOTION TO DISMISS**


**DALTON SAMUEL BROOKS**                                              **DEFENDANT**

\* \* \* \* \*

The United States submits this response in opposition to the Defendant's motion to dismiss. [R. 14: Motion.] As set forth below, the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), does not overrule Sixth Circuit precedent upholding 18 U.S.C. § 922(g)(1). Nevertheless, even if the Court were to consider the issue anew, § 922(g)(1) remains constitutional after *Bruen*. At the very least, § 922(g)(1) is constitutional as applied to the Defendant, who has prior convictions for failure to comply with the order or signal of a police officer and aggravated drug trafficking. Finally, 26 U.S.C. § 5861(d) is, likewise, constitutional after *Bruen*. The Defendant's motion should therefore be denied.

**I.      Factual Background and Procedural History**

On June 8, 2023, a federal grand jury charged the Defendant with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and receipt or possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). [R.

1

1: Indictment.]  The Defendant concedes he is a convicted felon. [R. Motion at 34.] In 2021, the Defendant was convicted of failure to comply with an order or signal of a police officer, in violation of O.R.C. § 2921.331(B), a third-degree felony, and aggravated drug trafficking, in violation of O.R.C. § 2925.03(A)(1), a fourth-degree felony.  [Exhibit 1.]  Despite these prior convictions, the Defendant asks the Court to dismiss the Indictment on the basis that the statutes under which he is charged, 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861(d), violate his Second Amendment right to bear arms. [R. 14: Motion at 34, 43.]

## II.    Argument

### A.    Section 922(g)(1) does not violate the Second Amendment

#### 1.    *Bruen* does not abrogate the constitutionality of § 922(g)(1)

In *United States v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court determined that the Second Amendment protects the right of "law-abiding citizens" to keep firearms in their homes for self-defense.  However, this right is not unlimited. *Id.* at 626. *Heller* emphasized that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . .".  *Id*. at 626-27 & n.26.

After *Heller*, the Sixth Circuit, along with several other circuits, adopted a two-pronged approach to Second Amendment challenges in *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) (abrogated by *Bruen*).  Under the first step, "the government must show 'that the challenged statute regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment – 1791 [Bill of

2

Rights ratification] or 1868 [Fourteenth Amendment ratification]." *Stimmel v. Session*, 879 F.3d 198, 204 (6th Cir. 2018) quoting *Greeno* at 518. "If the government satisfies its initial burden, 'then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" *Id.* If not, "there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Greeno* at 518.

While *Heller* did not "expound upon the historical justifications" for felon-in-possession statutes (*Heller* at 635), it affirmed that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. Relying on this statement, the Sixth Circuit upheld § 922(g)(1) in *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) and cited the prohibition approvingly in *Greeno*. *See Greeno* at 217; *see also United States v. Swaggerty*, 2017 WL 11622737 at *1 (6th Cir. Oct. 18, 2017) (explaining that *Heller* confirms the constitutionality of prohibiting convicted felons from possessing firearms).[1]

In 2022, the Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), holding that the Second Amendment protects the right of

---

[1] Recently, the Eighth Circuit also recognized that the long-standing prohibition on possession of a firearm by a convicted felon constitutional. *United States v. Cunningham*, 70 F. 4th 502 (8th Cir. 2023.) Textually and historically, § 922(g)(1) has been determined to be constitutional based on the first step of the post-*Heller* two-step framework. *See Medina v. Whitaker*, 913 F.3d 152, 157-161 (D.C. Cir. 2019) (finding that a felony conviction removes one from the scope of the Second Amendment based on "history and tradition" and, therefore, it was unnecessary to reach "the second step"); *see also Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (finding that a felony conviction removes one from "the category of law-abiding, responsible citizen" and "cannot succeed at "step one").

"ordinary, law-abiding citizens" to also "carry a handgun for self-defense outside the home." *Id*. at 2122.  Revisiting *Heller*, the Supreme Court observed that since *Heller*, lower courts had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Id*. at 2125-26. *Bruen* rejected the "two-step" framework as "one step too many." *Id.* at 2127.  However, *Bruen* observed that "[s]tep one is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127.

*Bruen* provided that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The Supreme Court clarified that when a defendant's conduct does fall within the Second Amendment's plain text, the government must then show that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.  While *Bruen* abrogated *Heller*'s means-end scrutiny second step, it did not call into question the constitutionality of felon-dispossession laws under *Heller*'s first step. *See United States v. Burgess*, No. 22-1110, 2023 WL 179886 at *5 (6th Cir. Jan. 13, 2023).

Post-*Bruen*, even though *Greeno*'s two-step inquiry has been eliminated,  the first step remains intact. *See Burgess* at *5 (quoting *Bruen* at 2126) (finding that *Bruen* did not do away with the first step of the analysis that "asks whether 'the government can prove that the regulated conduct falls beyond the Amendment's original scope.'").  This first step, based on *Heller*'s assurances that felon-in-possession statutes were not called into question, was the basis of the Sixth Circuit's precedent that found § 922(g)(1) constitutional.  That precedent remains controlling.

4

"Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller* at 626. *Heller* assured that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "law imposing conditions and qualifications on the commercial sale of arms." *Heller* at 626-627. In *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), the Supreme Court "repeat[ed] those assurances." These assurances were emphasized, again, and repeated by six Justices, a majority of the Supreme Court in *Bruen*. *See Bruen* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); *id*. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quotation marks omitted)).

Following these assurances, since *Bruen*, courts nationwide have soundly rejected Second Amendment challenges to § 922(g)(1) based on text, history, precedent, or a combination of the three.[2] Despite the Defendant's reliance on *Range v. Attorney General*,

---

[2] The Fifth Circuit has rejected two post-Bruen challenges to the constitutionality of Section 922(g)(1) on plain-error review. See *United States v. Roy*, No. 22-10677, 2023 WL 3073266, *1 (5th Cir. Apr. 25, 2023); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, *1 (April 25, 2023). And approximately 140 district-court decisions have similarly rejected Second Amendment challenges to Section 922(g)(1). See *United States v. Nelson*, ---F.Supp.3d---, 2023 WL 4249367 at *4 (E.D. Mich. June 29, 2023); *United*

*States v. Jordon*, No. 1:23CR159,2023 WL 4267602 (June 29, 2023 N.D. Ohio); *United States v. Meyer*, No. 22-cr-10012, Dkt. No. 53 (S.D. Fl. May 9, 2023); *United States v. Carter*, No. 22-cr-20477, Dkt. No. 51 (E.D. Mi. May 9, 2023); *United States v. Bluer*, No. 22-cr-20557, Dkt. No. 27 (E.D. Mi. May 8, 2023); *United States v. Hazley*, No. 22-cr-20612, Dkt. No. 32 (E.D. Mi. May 5, 2023); *United States v. Murphy*, No. 22-cr-121, Dkt. No. 42 (N.D. Ill. May 3, 2023); *United States v. Thompson*, No. 22-cr-173, Dkt. No. 53 (E.D. La. Apr. 7, 2023); *United States v. Taylor*, No. 22-cr-20315, Dkt. No. 36 (E.D. Mi. Apr. 26, 2023); *United States v. McIlwain*, No. 2:23-cr-20012, Dkt. No. 28 (E.D. Mi. Apr. 26, 2023); *United States v. Thomas*, No. 2:23-cr-20036, Dkt. No. 27 (E.D. Mi. Apr. 25, 2023); *United States v. Cummings*, No. 1:22-cr-51, Dkt. No. 49 (N.D. Ind. Apr. 20, 2023); *United States v. Payne*, No. 4:22-cr-173, Dkt. No. 24 (S.D. Tex. Apr. 12, 2023); *United States v. Guthery*, No. 2:22-cr-173, Dkt. No. 49 (E.D. Cal. Mar. 29, 2023); *United States v. Finney*, No. 2:23-cr-13, Dkt. No. 23 (E.D. Va. Mar. 29, 2023); *United States v. Dixon*, No. 1:22-cr-140, Dkt. No. 76 (N.D. Ill. Mar. 28, 2023); *United States v. Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023); *United States v. Hoeft*, No. 4:21-cr-40163, Dkt. No. 103 (D. S.D. Mar. 21, 2023); *United States v. Rice*, No. 3:22-cr-36, Dkt. No. 40 (N.D. Ind. Mar. 17, 2023); *United States v. Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023); *United States v. Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023); *United States v. Lindsey*, No. 4:22-cr-138, Dkt. No. 25 (S.D. Iowa Mar. 10, 2023); *United States v. Tribble*, No. 2:22-cr-85, Dkt. No. 48 (N.D. Ind. Mar. 10, 2023); *Leonard v. United States*, No. 1:22-cv-22670, Dkt. No. 15 (S.D. Fla. Mar. 10, 2023); United States v. Therrien, No. 1:21-cr-10323 (D. Mass. Mar. 6, 2023); *United States v. Price*, No. 1:19-cr-824, Dkt. No. 105 (N.D. Ill. Mar. 3, 2023); *United States v. Belin*, No. 1:21-cr-10040, Dkt. No. 65 (D. Mass. Mar. 2, 2023); *United States v. Clark*, No. 1:20-cr-49, Dkt. No. 61 (N.D. Ind. Mar. 2, 2023); *United States v. Braster*, No. 1:20-cr-66, Dkt. No. 42 (N.D. Ind. Mar. 2, 2023); United States v. Barnes, No. 1:22-cr-43, Dkt. No. 42 (S.D.N.Y. Feb. 28, 2023); *United States v. Beard*, No. 4:22-cr-92, Dkt. No. 58 (S.D. Tex. Feb. 27, 2023); *United States v. Smith*, No. 2:22-cr-20351, Dkt. No. 35 (E.D. Mich. Feb. 24, 2023); *United States v. Barber*, No. 3:22-cr-65, Dkt. No. 58 (D. Ak. Feb. 21, 2023); *United States v. Ross*, No. 2:22-cr-20049, Dkt. No. 34 (E.D. Mich. Feb. 15, 2023); *United States v. Price*, No. 1:21-cr-164, Dkt. No. 122 (N.D. Ill. Feb. 13, 2023); *United States v. Gleaves*, No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023); United States v. Bacchus, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023); *United States v. Isaac*, No. 5:22-cr-117, Dkt. No. 27, 2023 WL 1415597 (N.D. Ala. Jan. 31, 2023); *United States v. Taylor*, No. 3:22-cr-22, Dkt. No. 32, 2023 WL 1423725 (E.D. Ky. Jan. 31, 2023); *United States v. Barber*, No. 4:20-cr-384, Dkt. No. 118, 2023 WL 1073667 (E.D. Tex. Jan. 27, 2023); *United States v. Hester*, No. 1:22-cr-20333, Dkt. No. 39 (S.D. Fla. Jan. 27, 2023); *United States v. Brown*, No. 2:20-cr-260, Dkt. No. 186, 2023 WL 424260 (E.D. Pa. Jan. 26, 2023); *United States v. Rush*, No. 4:22-cr-40008, Dkt. No. 46, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023); *Davis v. United States*, No. 5:22-cv-224, Dkt. No. 1, 2023 WL 373172 (E.D. Ky. Jan. 24, 2023); *Battles v. United States*, No. 4:23-cv-63, Dkt. No. 2, 2023 WL 346002 (E.D. Mo. Jan. 20, 2023); *United States v.*

*Gordon*, No. 1:14-cr-312, Dkt. No. 170, 2023 WL 336137 (N.D. Ga. Jan. 20, 2023); *Shipley v. Hijar*, No. 3:23-cv-11, Dkt. No. 3, 2023 WL 353994 (W.D. Tex. Jan. 20, 2023); *United States v. Smith*, No. 2:19-cr-505, Dkt. No. 183 (C.D. Cal. Jan. 19, 2023); *United States v. Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023); *United States v. Tucker*, No. 2:22-cr-17, Dkt. No. 30, 2023 WL 205300 (S.D. W. Va. Jan. 17, 2023); *United States v. Robinson*, No. 4:22-cr-70, Dkt. No. 39, 2023 WL 214163 (W.D. Mo. Jan. 17, 2023); *United States v. Whittaker*, No. 1:22-cr-272, Dkt. No. 33 (D.D.C. Jan. 12, 2023); *United States v. Spencer*, No. 2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023); *United States v. Garrett*, No. 1:18-cr-880, Dkt. No. 144 (N.D. Ill. Jan. 11, 2023); *United States v. Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States v. Jordan*, No. 3:22-cr-1140, Dkt. No. 39, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023); *Campiti v. Garland*, No. 3:22-cv-177, Dkt. No. 27 (D. Conn. Jan. 10, 2023); *United States v. Coleman*, No. 3:22-cr-8, Dkt. No. 117, 2023 WL 122401 (N.D. W.Va. Jan. 6, 2023); *United States v. Medrano*, No. 3:21-cr-39, Dkt. No. 65, 2023 WL 122650 (N.D. W.Va. Jan. 6, 2023); *United States v. Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan. 5, 2023); *United States v. Good*, No. 1:21-cr-180, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022), report and recommendation adopted, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023); *United States v. Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Jones*, No. 5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022); *United States v. Williams*, No. 1:21-cr-362, 2022 WL 17852517 (N.D. Ga. Dec. 22, 2022); *United States v. Dawson*, No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022); *United States v. Goins*, No. 5:22-cr-91, Dkt. No. 32 (E.D. Ky. Dec. 21, 2022); *United States v. Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022); *United States v. Roux*, No. 1:22-cr-19 (D. N.H. Dec. 16, 2022); *United States v. Hunter*, No. 1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022); *United States v. Spencer*, No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States v. Dotson*, No. 3:22-cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022); United States v. Tran, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022); *United States v. Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022); *United States v. Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States v. Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States v. Grinage*, No. 5:21-cr-399, Dkt. No. 51, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States v. Wagoner*, No. 4:20-cr-18, Dkt. No. 262, 2022 WL 17418000 (W.D. Va. Dec. 5, 2022); *United States v. Gay*, No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022); *Shelby-Journey-Egnis v. United States*, No. 2:21-cr-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022); *United States v. Glaze*, No. 5:22-cr-425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022); *United States v. Ford*, No. 4:21-cr-179, Dkt. No. 52, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States v. Jones*, No. 4:20-cr-354, Dkt. No. 78, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States v. Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022); *United States v. Cage*, No. 3:21-cr-68, Dkt. No. 41, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022); *United States v. Willis*, No. 1:22-cr-186, Dkt. No. 36 (D. Colo. Nov. 23, 2022); *United States v. Teerlink*, No. 2:22-cr-24, Dkt. No. 33,

2022 WL 17093425 (D. Utah Nov. 21, 2022); *United States v. Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022); *United States v. Hill*, No. 4:22-cr-249, Dkt. No. 42 (S.D. Tex. Nov. 17, 2022); *United States v. Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022); *United States v. Mitchell*, No. 1:22-cr-111, Dkt. No. 43 (S.D. Ala. Nov. 17, 2022); *United States v. Dumont*, No. 1:22-cr-53 (D. N.H. Nov. 14, 2022); *United States v. Baker*, No. 2:20-cr-301, Dkt. No. 179, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States v. Carpenter*, No. 1:21-cr-86, Dkt. No. 38, 2022 WL 16855533 (D. Utah Nov. 10, 2022); *United States v. Gray*, No. 1:22-cr-247, Dkt. No. 22, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Moore*, No. 2:21-cr-121, Dkt. No. 81 (W.D. Pa. Nov. 9, 2022); *United States v. Reese*, No. 2:19-cr-257, Dkt. No. 193 (W.D. Pa. Nov. 8, 2022); *United States v. Young*, No. 2:22-cr-54, Dkt. No. 47 (W.D. Pa. Nov. 7, 2022); *United States v. Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022); *United States v. Burton*, No. 3:22-cr-362, Dkt. No. 48 (D. S.C. Oct. 28, 2022); *United States v. Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022); *United States v. Grant*, No. 3:22-cr-161, Dkt. No. 44, 2022 WL 16541138 (D. S.C. Oct. 28, 2022); *Walker v. United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States v. Law*, No. 2:20-cr-341, Dkt. No. 60 (W.D. Pa. Oct. 27, 2022); *United States v. Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Minter*, No. 3:22-cr-135, Dkt. No. 33 (M.D. Pa. Oct. 18, 2022); *United States v. Melendrez-Machado*, No. 3:22-cr-634, Dkt. No. 32, --- F. Supp. 3d ----, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022); *United States v. Raheem*, No. 3:20-cr-61, Dkt. No. 389, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022); *United States v. Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Trinidad*, No. 3:21-cr-398, Dkt. No. 99, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States v. Carrero*, No. 2:22-cr-30, Dkt. No. 50, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States v. Riley*, No. 1:22-cr-163, Dkt. No. 37, 2022 WL 7610264 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 2:22-cr-97, --- F. Supp. 3d ----, 2022 WL 6968457, at *6-9 (S.D. W.Va. Oct. 12, 2022); *United States v. King*, No. 7:21-cr-255, Dkt. No. 50, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022); *United States v. Daniels*, No. 1:03-cr-83, Dkt. No. 69, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 7:22-cr-154, Dkt. No. 48, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Harper*, No. 5:21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022), report and recommendation adopted, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Campbell*, No. 5:22-cr-138, Dkt. No. 64 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 1:21-cr-205, Dkt. No. 54, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 7:22-cr-141, Dkt. No. 66, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No. 3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022); *United States v. Coombes*, No. 4:22-cr-189, Dkt. No. 39, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70,

69 F.4th 96 (3rd Cir. 2023) (*en banc*), the Third Circuit's decision is an outlier.[3]  Instead, the Eighth Circuit's recent decision in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) is more in line with the vast number of district court decisions finding § 922(g)(1) constitutional and highlighting the Supreme Court's assurances in *Heller* and *McDonald* that felon-in-possession bans are lawful.  *Id*. at 502*; see also United States v. Cunningham*, 70 F. 4th 502 (8th Cir. 2023) (holding that the longstanding prohibition on possession of firearms by felons is constitutional).  "*Bruen* did nothing to change the prohibition on the possession of firearms by felons, which remains well-settled law."  *United States v. Davis*, No. 5: 19-CR-159-DCR, 2023 WL 373172 (E.D. Ky. Jan. 24, 2023); *see also United States v. Parker*, No. 3:22-CR-82-RGJ, 2023 WL 3690247 at *2 (E.D. Ky. May 26, 2023) (finding that "§ 922(g)(1) is thus constitutional under *Heller*, *McDonald*, and *Bruen*").

---

2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 5:21-cr-6, Dkt. No. 31 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. 0:21-cr-51, Dkt. No. 114, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 7:19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 5:21-cr-21, Dkt. No. 34 (N.D. W.Va. Sept. 9, 2022); *United States v. Burrell*, No. 3:21-cr-20395, Dkt. No. 34, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 0:18-cr-557, Dkt. No. 1714, --- F. Supp. 3d ---, 2022 WL 3691350 (D. S.C. Aug. 25, 2022); *United States v. Nevens*, No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 1:22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 1:20-cr-628 (S.D.N.Y. Aug. 10, 2022); United States v. Ramos, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022); *United States v. Doss*, No. 4:21-cr-74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022); *United States v. Maurice*, No. 7:22-cr-48 (S.D.N.Y. Jul. 14, 2022).

[3] The Defendant also cites *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023).  That case is also an outlier and is currently on appeal to the United States Court of Appeals for the Fifth Circuit.  *See United States v. Bullock*, No. 23-60408 (5th Cir. filed July 28, 2023).

Given this clear and unambiguous declaration from the Supreme Court in *Heller*, *McDonald*, and *Bruen*, the Sixth Circuit decisions likewise upholding the constitutionality of § 922(g)(1) pursuant to *Heller*'s assurance are not undermined.  *See Carey* at 740-41; *see also United States v. Frazier*, 314 Fed. Appx. 801, 806-7 (6th Cir. 2008).  Even if the Supreme Court's assurances in *Heller* and *Bruen* would be considered dicta (*see United States v. Khami*, 362 Fed. Appx. 501, 507 (6th Cir. 2010)), "[l]ower courts are 'obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'" *American Civil Liberties Union of Kentucky v. McCreary County, Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002).

*Heller* was decided in 2008, *McDonald* in 2010, and *Bruen* in 2023, none of which have particular "age."  Nor do the statements made in *McDonald* and *Bruen* "undermine" *Heller*'s rationale.  Rather, these cases reinforce it. *See also Khami* at 508 (6th Cir. 2010) (holding that "[t]he dicta in *Heller* carries significant weight in our analysis, especially since the Defendant appears to be raising a facial challenge to this statute, which would require the Defendant to argue that the felon-in-possession statute is unconstitutional as applied to all felons covered by the statute").

This Court is bound by *Heller* and *Bruen*'s language as well as the Sixth Circuit decisions in *Carey* and *Frazier*. *See Hall v. Eichenlaub*, 559 F.Supp.2d 777, 781-82 (E.D. Mich. 2008) (citations omitted) ("Absent a clear directive from the Supreme Court or a decision of the Court of Appeals sitting *en banc*…a district court[] is not at liberty to reverse the circuit's precedent.  In the absence of Supreme Court precedent directly on

10

point, a district court should decline to 'underrule' established circuit court precedent.
Moreover, a district court is bound by the decisions of the Circuit Court of Appeals in
which it sits.").  Because § 922(g)(1) is constitutional as a whole, without regard to the
specific felony convictions involved, the Defendant's challenge to the constitutionality,
even as-applied to him, should be denied.

### 2. The Second Amendment's Text and Historical Context Supports the Constitutionality of 922(g)(1)

Even if *Bruen* did abrogate Sixth Circuit precedent on § 922(g)(1), the Second
Amendment's text does not prevent Congress from banning firearm possession by all
felons. A review of history reveals that § 922(g)(1) is consistent with the Nation's historical
tradition of firearm regulation.

### a. The Second Amendment's Text

The plain language of the Second Amendment states that "a well regulated Militia,
being necessary to the security of a free State, the right of the people to keep and bear
Arms, shall not be infringed." U.S. Const. Amend II.  In *Heller*, the Supreme Court
referred to "the people" as "members of the political community."  *Heller* at 580.
However, history shows that felons do not fall within "the people" provided in the text of
the Second Amendment.   And as a felon, the Defendant's argument that he is not
excepted from "the people" covered by the Second Amendment is incorrect.  [R. 14:
Motion at 39.]

Legislatures historically had wide latitude to exclude felons from the political
community. As Thomas Cooley explained in his "massively popular 1868 Treatise on

Constitutional Limitations," *Heller* at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Felons could, therefore, historically be excluded from "exercis[ing] the elective franchise," *id*. at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998). "The commission of a felony often results in the lifelong forfeiture of a number of rights, including the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

This comports with Justice Scalia's opinion in *Heller* that the right of "the people" protected by the Second Amendment referred to "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller* at 635. This reference to "law-abiding citizens" is not a throw-away line. The phrase was repeated often by a majority of the Supreme Court in *Bruen*. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an "ordinary, law-abiding citizen" to possess a handgun in the home for self-defense"); *Id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of 'law-abiding, responsible citizens' to use arms' for self-defense"); *Id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-

12

abiding citizen's right to armed self-defense"); *Id.* at 2156 (holding that New York's
licensing law violates the Second Amendment because "it prevents law-abiding citizens
with ordinary self-defense needs from exercising their right to keep and bear arms").
*Bruen* references the Second Amendment as belonging to law-abiding citizens numerous
times.  *Id.* at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156; s*ee also id.*
at 2159 (Alito, J. concurring) ("All that we decide in this case is that the Second
Amendment protects the right of law-abiding people to carry a gun outside the home for
self-defense.")  In fact, the Sixth Circuit has also approvingly referenced *Bruen*'s
repeated "law-abiding citizens" language in a Second Amendment challenge to 18 U.S.C.
§ 924(c) and a firearm sentencing enhancement under USSG § 2D1.1(b)(1) in *United
States v. Burgess*, *supra*.

     In *Bruen*, while the Supreme Court invalidated New York's "may issue" licensing
scheme, it approved of "shall issue" licensing schemes that "require applicants to
undergo a background check or pass a firearms safety course."  *Id.* at 2138, n.9; *see Id*. at
2162 (Kavanaugh, J., joined by Roberts, C.J. concurring).  In doing so, the Court noted
that "shall-issue regimes, which often require applicants to undergo a background check
or pass a firearms safety course, are designed to ensure only that those bearing arms in
the jurisdiction are, in fact 'law-abiding, responsible citizens.'"  *Id*. quoting *Heller*.  It
would make little sense for the Supreme Court to endorse these "shall issue" licensing
schemes outright if legislatures were prevented under the Second Amendment from
disarming felons. In other words, "conviction of a felony necessarily removes one from

the class of 'law-abiding, responsible citizens' for purposes of the Second Amendment."
*Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017).

The Second Amendment's text, along with the Supreme Court's decisions interpreting that text, demonstrate that the Constitution does not prohibit the disarming of convicted felons as a whole.

> **b.     The Second Amendment's Historical Context**

Whether  felons are considered part of "the people" for Second Amendment purposes, the historical record supports the position that felons may still be disarmed. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."  *Heller* at 634-635.  Because the Second Amendment codified a right inherited from our English ancestors, *Heller* at 599, English regulations can be used in conducting the historical analysis. *Bruen* at 2136.

Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law.  *See, e.g.*, 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688) (codifying an "Act for the better secureing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person"). This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of

Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, at 2141 (quoting *Heller* at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (specifying that that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law").

"This 'predecessor to our Second Amendment' reveals that the legislature – Parliament – was understood to have the authority and discretion to decide who was sufficiently law-abiding to keep and bear arms." *Range* at 121 (Krause, J. dissenting). Thus, the Second Amendment codified a pre-existing right that was "not unlimited" and could be withheld from certain individuals such as non-law-abiding citizens. *Heller* at 626; *see also Bruen* at 2128.

This understanding carried over to the Constitution's ratification process. In what *Heller* called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts ratifying convention recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) (quoting 2 Schwarz, *The Bill of Rights* 675, 681). These "Second Amendment precursors proposed in the state conventions," *Heller* at 603,

reflected the well-established common-law principle that dangerous people, such as felons, could be disarmed.

While these proposals were not ultimately incorporated into the Second Amendment, the historical analysis is still useful. "In some cases," the inquiry into "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" will "be fairly straightforward." *Bruen* at 2131. However, *Bruen* recognized that the historical understanding may not be as straightforward as "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id*. at 2132. More importantly, *Bruen* explained that "[a]lthough its meaning is fixed according to the understanding of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*.

The absence of the limiting proposals in the Second Amendment did not evidence a rejection of the language, but, rather, reflect such a general acceptance and understanding of the limitation for keeping arms that it was unnecessary to write an understood prohibition into the final draft of the Amendment. For example, the Pennsylvania antifederalist proposal also included a proposed provision guaranteeing the right "for the defence of themselves, and their own state, or the United States, or for the purpose of killing game." *The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents*, December 12, 1787. This language, and especially language referencing the "killing of game," also was not incorporated into

16

the text of the Second Amendment.  Yet, no one could seriously question a law-abiding citizen's right to hunt.

"[T]ime and again, the Supreme Court has acknowledged that the deep roots of felon-possession bans in American history impart a presumption of lawfulness." *Range* at 119 (Krause, J. dissenting).  "[I]n 'classical republican philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the virtuous citizen,' such that 'the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2010) quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue,* Law & Comtemp. Probs., Winter 1986, at 146 (1986).  "What concerned the Framers was that 'virtuous citizens' retain the right to bear arms; they had no interest in extending the same guarantees to those who act counter to society's welfare." *Folajtar v. Attorney General of the United States*, 980 F.3d 897, 909 (3rd Cir. 2020) (abrogated by *Range*) (internal citations omitted).

*Bruen* did not change this concept with respect to felons.  *See Bruen* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*... about restrictions that may be imposed on the possession or carrying of guns."); *id*. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "'longstanding prohibitions on the possession of firearms by felons'" discussed in *Heller* and *McDonald* (quoting *Heller* at 626, 636)); *id*. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing

17

firearms).  As the Eight Circuit recently stated post-*Bruen*, "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society."  *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023).

### 3.    The Disarmament of Felons under 922(g)(1) is Consistent with the Nation's Historical Tradition of Firearms Regulation

The whole of 922(g)(1)'s constitutionality is further supported by the Nation's historical tradition of firearm regulations.  As discussed in *Bruen*, when looking to the Nation's historical traditions, the inquiry will "often involve reasoning by analogy." *Id*. 2132.  This "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" and is not "a regulatory straightjacket."  *Id*. at 2133.   "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2118.

### a.    Capital Punishment and Estate Forfeiture

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them."  *Id*. at 98 (capitalization omitted).

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar* at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. 2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785-1788) at 664-65 (1886). The act also established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offence committed, or at any time after." *Id.* at 666. Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New*

19

*York Passed at the Sessions of the Legislature* (1785-1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id*. at 261.

In 1777, Virginia adopted a law for the punishment of forgery, counterfeiting, or presenting for payment a wide range of forged documents. The law provided that such a person "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 at 302-03 (1821).

In 1700, Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 *Statutes at Large of Pennsylvania from 1682 to 1801* at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id*. at 178.

A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate

or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). Further, a 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 545 (1878).

Against this extensive history, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

### b.   Dangerous and Untrustworthy Individuals

Historically, the Second Amendment's right to keep and bear arms also did not extend to persons who posed a danger to the state or community. Looking back at English history, common law tradition of disarming citizens dates back to the 14th century. The Statute of Northampton was "a product of…the acute disorder that []plagued England" during a time when "[b]ands of malefactors, knights as well as those of lesser degree,

harried the country, committing assaults and murders." *Bruen* at 2139 quoting K. Vickers, *England in the Later Middle Ages* (1926).

The Statute of Northampton "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.'" *Id.* quoting 2 Edw. 3 c. 3 (1328). Most early violations of the Statute involved breaches of the peace. *Id.* at 2140.

The Statute of Northampton was used in the prosecution of Sir John Knight when he "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Id.* at 2141 quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686). "The act of "go[ing] armed *to terrify* the King's subjects" was "a great offence at the *common law*" and that the Statute of Northampton "is but an affirmance of that law." *Id.* quoting *3* Mod., at 118, 87 Eng. Rep., at 76. Parliament would draft the English Bill of Rights, the predecessor to the Second Amendment, three years later, with the Statute of Northampton remaining in effect.

Similarly, in the late-18th century and early-19th century, American states enacted laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id*. at 2144-2145 (internal quotations omitted). As *Bruen* observed, such statutes "all but codified the existing common law in this regard." *Id*. at 2144 n.14 (citing George

22

Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively in a threatening manner and authorized the arrest of those who did. *See* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, 52-53 (1869) (1692 statute); *Acts and Laws of His Majesty's Province of New-Hampshire: In New-England*, 1; *with Sundry Acts of Parliament* 17 (1771) (1701 statute); 1 *Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State* 131-32 (1821) (1741 statute); *Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 33 (1794) (1786 statute).

"[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter* at 458 (Barrett, J., dissenting). "From Bracton to Blackstone, the common law understood that the sovereign could strip individuals of weapons if it deemed them violent or a threat to disturb the peace. The colonists inherited this understanding as well." *United States v. Goins*, --- F. Supp.3d ---, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022). "Simply put, the history and tradition relevant to the Second Amendment support Congress's power to disarm those that it deems dangerous. *Id*.

"[D]angerousness was one reason to restrict firearm possession, but it hardly was the only one." *Folajtar* at 909. Another example of disarmament pertained to groups deemed by Founding legislatures to pose "immediate threats to public safety and stability." *Kanter* at 458 (Barrett, J. dissenting). For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of

23

allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted).  And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king. 7 *Statutes at Large; Being A Collection of All the Laws of Virginia* 35-36 (1820) (1756 law).  "Pennsylvania also disarmed entire groups whose status suggested they could not be trusted to abide by the law." *Range* at 125 (Krause, J. dissenting).  Pennsylvania enacted a loyalty statute in 1777 that provided the disarmament of individuals who failed to take an oath of allegiance.  *Id.* "This statute is especially illuminating because Pennsylvania's 1776 constitution protected the people's right to bear arms."  *Id*.  "Yet the disarmament law deprived sizable numbers of pacifists of that right because oath-taking violated the religious convictions of Quakers, Moravians, Mennonites, and other groups. Those groups were not disarmed because they were dangerous." *Id*.

Like the Pennsylvania statute, at the recommendation of the Continental Congress, see 4 *Journals of the Continental Congress* 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states.  S*ee, e.g.*, 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479 (1886) (1776 law); 7 *Records of the Colony of Rhode Island and Providence Plantations, in New England* 567 (1776 law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 law); 9 *Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 law); *Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey* 90 (1777 law); 9 *Statutes at Large of Pennsylvania* 348 (1779 law).

24

Again, these laws demonstrate that, at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and trustworthy. While some may "attempt to shoehorn all of these...laws into the silo of dangerousness, a more accurate reading recognizes that while some ratification and legislative bodies at the Founding focused on the dangers that certain people posed, others disarmed a broader portion of the populace based on "virtuousness" and the seriousness of the crime." *Folajtar* at 909. This is because "the scope of the Second Amendment was understood to exclude more than just individually identifiable dangerous individuals." *Medina* 913 F.3d at 159.

### c.      The Historical Record Analogized to § 922(g)(1)

*Bruen* identified two relevant metrics for its analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 2133. The "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. (emphasis and quotations omitted).

Under *Bruen*'s first metric, § 922(g)(1) imposes no "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen* at 2133. As discussed previously, convicted felons are not "law-abiding," and the effect of a felony conviction removes them from the class of *Bruen* and *Heller*'s "law-abiding, responsible citizens." Any burden that § 922(g)(1) does impose on a felon's rights is comparable to historical laws disarming untrustworthy or dangerous individuals, especially when those laws were more severe in punishment, often including death and forfeiture of one's entire estate.

25

Furthermore, the modern and historical laws are "comparably justified." *Bruen* at 2133. The historical laws sought to adequately punish felons and deter re-offending, as well as to protect society from the untrustworthy and dangerous. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend, potentially in dangerous ways.

*Bruen* does not require the United States to identify a "historical twin," but, rather, need only identify a "historical analogue" that is "relevantly similar." *Bruen* at 2132-33. Nor does *Bruen* suggest that a statute is unconstitutional simply because it involves a new way to address longstanding concerns. As *Bruen* recognized, some modern statutes implicate "unprecedented societal concerns," and some modern regulations "were unimaginable at the founding." *Id*. at 2132. Therefore, the lack of an identical historical statute does not mean that the Founders would have viewed § 922(g)(1) as violating the Second Amendment. As one district court observed, a "list of the laws that happened to exist in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022).

Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation and, therefore, is constitutional in all its applications.

26

**B.      The Defendant's As-Applied Challenge Must Fail**

For the reasons discussed in the preceding sections, the Second Amendment does not require distinction between violent and non-violent felons.   As-applied to the Defendant, § 922(g)(1) is at least constitutional in prohibiting individuals who, like him, are dangerous felons. A minority of judges and commentators have maintained that the Second Amendment allows disarming only "dangerous" felons, *see Kanter*, 919 F.3d at 451, 454, 464 (7th Cir. 2019) (Barrett, J. dissenting); Joseph G.S. Greenleem *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257-67, 285-86 (2020).  However, this view is incorrect, lacking support in either *Heller*'s interpretation of the Amendment's text or the historical record.  Still, the Defendant can be disarmed under § 922(g)(1) even under this minority view.

In *Range*, the *en banc* Third Circuit held that 922(g)(1) was unconstitutional as applied to an individual who had been convicted 20-plus years earlier of food stamp fraud under state law, "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms." *Range*, 69 F.4th at 106.  The facts of *Range*, however, and distinguishable. Here, the Defendant is charged with being a felon in possession of a firearm, and the Defendant's criminal record aggravated drug trafficking and failure to comply with a police officer. The Defendant cannot credibly assert that he is "like Range."  *See Range*, 69 F.4th at 131 (Krause, J. dissenting) (criticizing the court for jettisoning a "straightforward test" for barring firearm possession – a felony conviction – and replacing it "with an opaque inquiry – whether the offender is 'like Range'").

27

This is also not the first instance that an as-applied analysis to the constitutionality of § 922(g)(1) has been conducted in this district.  *See United States v. Goins*, --- F.Supp.3d ---, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022) and *United States v. Taylor*, 3:22-CR-00022-GFVT, 2023 WL 1423725 (E.D. Ky. Jan. 31, 2023).  In *Goins* and *Taylor*, another court in this district determined that the Second Amendment allows Congress to disarm people that "pose a threat to public safety," *Taylor* at *2, or "have committed crimes that indicate they are a danger to the public safety."  *Goins* at *10. In *Taylor*, the district court concluded that the defendant was categorically disarmed due to a prior felony burglary conviction.  *Taylor*, 2023 WL 1423725, at *4.   In *Goins*, the defendant's felony convictions consisted of a fourth DUI offense and simple possession of a controlled substance.  *Goins*, 2022 WL 17836677.   There, the district court concluded that the defendant's crimes "represent a more serious and direct threat to public safety."  *Id*. at *13.

Here, the Defendant has likewise proven a threat to public safety by virtue of his prior convictions for aggravated drug trafficking and failure to comply with a police officer.   Drug trafficking is an inherently dangerous offense.   As recognized by the district court in *Goins*, "[s]erious drug offenses, like distribution or possession with the intent to distribute, are inherently violent offenses that justify disarming those who commit them."  *Id*. citing *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011).   Additionally, efforts to elude or flee from a police officer are often dangerous to the public, and a willingness to disobey a police officer rather than stop "indicates" that the Defendant is "a danger to public safety."  *Goins*, at *9-10.  Thus, the Defendant's

28

felony convictions place him in the category of individuals that Congress can disarm constitutionally after the Second Amendment.

### C.    Section 5861(d) does not violate the Second Amendment.

The Defendant also seeks to dismiss count two of the indictment, claiming that Section 5861(d) also violates the Second Amendment.  [R. 14: Motion at 43.]  That argument lacks merit.

It is well established that the Second Amendment does not protect possession of short-barreled shotguns, and nothing in *Bruen* says otherwise. First, the plain text of the Second Amendment does not guarantee an unequivocal right to possess a short-barreled shotgun.  Over 80 years ago, in *United States v. Miller*, the Supreme Court determined that the plain text of the Second Amendment does not guarantee a right to possess a short-barreled shotgun, stating that "we cannot say that the Second Amendment guarantees the right to keep and bear" an unregistered sawed-off "shotgun having a barrel of less than eighteen inches in length."  307 U.S. 174, 175-78 (1939); *Heller*, 554 U.S. at 625 (reading *Miller* to say that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").[4]

Second, possession of a short-barreled shotgun is not grounded in this country's historical tradition.  *Heller* held that the Court's reading in *Miller* -- that the Second

---

[4] 26 U.S.C. 5845(a) defines a firearm as, among other things, "(1) a shotgun having a barrel or barrels of less than 18 inches in length; (1) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length… ."

Amendment protects only the "sorts of weapons" that were "in common use at the time" and does not protect "those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*.

Bruen did not overturn *Miller* and *Heller*.  To the contrary, it relied on these decisions.  142 S. Ct. at 2127-28, 2132, 2134-35.  *Bruen* reiterated that there is no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("[A]sawed-off shotgun may be concealed under a large shirt or coat….[T]he combination of low, somewhat indiscriminate accuracy, large destructive power, and the ability to conceal…makes a sawed-off shotgun useful for only violence against another person, rather than, for example, against sport game.").

Third, Section 5861(d) is not a blanket prohibition on firearms, but rather codifies the NFA's registration regime for certain types of firearms, including the short-barreled shotgun at issue in this case. *See Cox*, 906 F.3d at 1179 (discussing at length the National Firearms Act taxation and licensing scheme for short-barreled weapons).  *Bruen* did not undermine this regime; rather, *Bruen* specifically approved of licensing regimes for carrying firearms, so long as those regimes are open to ordinary, law-abiding citizens. 142 S. Ct. at 2161 (Kavanaugh, J., concurring).  Here, Section 5861(d) does not require "demonstrating to government officers some special need" to possess a short-barreled shotgun in the discretionary manner that *Bruen* held unconstitutional.  142 S. Ct. at 2156.

The Defendant's conduct, therefore, falls outside the Second Amendment's protections.[5]  The plain text does not guarantee the Defendant the right to possess a short-barreled shotgun and such a prohibition, as set forth in Section 5861(d), is well within the "historical tradition of prohibiting the carrying of 'dangerous and usual weapons.'" *Heller*, 554 U.S. at 627.  *Bruen* does not change that result.

Finally, the Defendant's argument that it was impossible for him to comply with Section 5861(d) also misses the mark.  The Defendant could have easily complied with § 922(g) and § 5861(d) by simply declining to possess the firearms alleged in the Indictment.  *See United States v. Rivera*, 58 F.3d 600, 601-02 (11th Cir. 1995) (holding that prohibition against firearm by a convicted felon does not render registration of such firearms "legally impossible"); *see also United States v. Bournes*, 339 F.3d 396, 399 (6th Cir. 2003) (holding that a defendant could comply with § 922(o) and § 5861(d) simply by electing not to possess the machine guns at issue in the case).

## III.    Conclusion

For the foregoing reasons, the Defendant's motion should be denied.

---

[5] Several courts around the country have similarly rejected challenges to prosecutions under Section 5861(d) for possessing unregistered dangerous weapons. *See, e.g., United States v. United States v. Wuchter*, 23-CR-2024, 2023 WL 4999862 (N.D. Iowa Aug. 4, 2023) (collecting post-*Bruen* district court cases finding Section 5862(d) constitutional).

31

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   /s/ Kyle M. Winslow
Assistant United States Attorney
207 Grandview Drive, Suite 400
Ft. Mitchell, Kentucky 41017
(859) 655-3200
FAX (859) 655-3212
kyle.winslow@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I filed the foregoing using the CM/ECF system, which will automatically send a notice of electronic filing to counsel for the Defendant.

/s/ Kyle M. Winslow
Assistant United States Attorney