UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
No. 2:23-CR-26-1-DLB-CJS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff ) <br>)<br>vs. )<br>)<br>DALTON SAMUEL BROOKS, )<br>)<br>Defendant )<br>_____) | **Reply Memorandum Supporting**<br>**Defendant's Motion to Dismiss** |

The test that we set forth in [*District of Columbia v.*] *Heller* [554 U.S. 570 (2008)] and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.[1]

History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons.[2]

\*     \*     \*     \*     \*

**Argument**

**The Court is not bound and defendant's motion not precluded by the Sixth Circuit's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010)**

The government urges that the Court is bound to follow and Brooks' motion foreclosed by dicta in *Dist. of Columbia v. Heller,* 554 U.S. 570 (2008) and *Bruen* "as well as the Sixth Circuit decisions in *Carey*."[3]  The government is incorrect regarding Sixth Circuit precedent for two reasons: (1) neither *Carey* nor *Frazier* established a precedential decision binding on this Court; and, (2) even if they had, they were superseded by the Sixth Circuit's discussion and analysis in *Tyler v. Hillsdale Co. Sheriff's Office*, 837 F.3d 678 (6th Cir. 2016)(*en banc*).

---

[1] *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2131 (2022).
[2] *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019)(Barrett, J., dissenting).
[3] *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010); *United States v. Frazier*, 314 Fed.Appx. 801 (6th Cir. 2008).

*Carey* was an appeal of a district court's denial of a motion to expunge a gambling conviction. The appellant conceded ***incorrectly***, and the Sixth Circuit adopted and repeated the concession, that *Heller* "specifically upheld firearm prohibitions for felons." 602 F.3d at 739. *Heller* did no such thing and the adoption of this erroneous concession does not now bind this Court. As the Sixth Circuit has explained, binding precedent is not created for "a later case just because, in an earlier one, a party conceded an issue and the panel took that concession at face value." *Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019).

Second, even if *Carey* was a precedential decision, it was superseded by the later *en banc* Sixth Circuit's analysis in *Tyler v. Hillsdale Co. Sheriff's Office*, *supra*.[4] In *Tyler*, the plaintiff had been committed involuntarily many years earlier to a mental hospital. *Id*. at 687. He filed an action seeking a declaratory judgment that 18 U.S.C. § 922(g)(4)[5] was unconstitutional as applied to him. *Id*.

*Tyler* thus placed in direct issue the dicta from *Heller*[6] that the defendant in *Carey* construed erroneously as a specific holding and the *Carey* panel adopted mistakenly. The *en banc* Sixth Circuit recognized this:

> *Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis. A presumption

---

[4] Brooks also discussed *Tyler* in his main memorandum in the context of discussing why Sixth Circuit law concludes that Brooks, notwithstanding his status as a felon, is among "the people" covered by the Second Amendment.

[5] 18 U.S.C. § 922(g)(4) makes it a felony for anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess a firearm.

[6] The relevant dicta in *Heller* is as follows:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27.

implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." 837 F.3d at 686. (citation omitted).

Furthermore, *Bruen* reversed the field and established that conduct covered by the Second Amendment is "presumptively protect[ed]" by it. 142 S.Ct. at 2126. "[A]fter Bruen, the burden to prove historical analogues rests on the government, not the defendant." *United States v. Bullock*, __ F.Supp.3d __, 2023 WL 4232309 at #31 (S.D. Miss., 6/28/23). The government's argument that Brooks' as-applied challenge to § 922(g)(1) is without merit.

The government cites dicta offered in *Heller*, *McDonald* and in concurring and dissenting opinions in *Bruen* to the effect that the rulings in those cases did not reach "long-standing prohibitions" regarding possession of firearms by felons. However, the Third Circuit's *en banc* decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), Judge Van Tatenhove's opinion in *United States v. Goins*, __ F.Supp.3d __, 2022 WL 17836677 and the very recent decision in *United States v. Bullock*, *supra* did not.

The Third Circuit in *Range* concluded that § 922(g), a law passed nearly 150 years "after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification – falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." 69 F.4th at 104. While the government labels *Range* an outlier, it fails to address let alone poke holes in the Third Circuit's analysis or reasoning.

The Supreme Court in *Bruen* directed a historical inquiry and further observed that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment was 1791, 142 S.Ct. at 2136, and long before the first felon-in-possession laws appeared in the 20th century. C.K. Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Harv. J.L & Pub. Pol'y 695, 708 (2009)("[O]ne can

with a good degree of confidence say that bans on convicting possessing firearms was unknown before World War I."). [7] A law passed nearly a century and a half after the Second Amendment's adoption is not long-standing, a point that seems, as the Supreme Court said some historical inquiries are, 142 S.Ct. at 2131, straightforward.

Judge Van Tatenhove in *Goins* noted that "the majority opinion in *Bruen* did not recommit to upholding felon in possession laws," and further noted that the Sixth Circuit in *Tyler*, *supra*, had seen the door left open for as-applied challenges like Brook's to § 922(g)(1). 2022 WL 17836677 at *3-4.

The Court in *United States v. Bullock*, *supra*, offered an additional rationale: "[t]reating dicta as binding violates the 'one doctrine more deeply rooted than any other in the process of constitutional adjudication': 'that we ought not to pass on questions of constitutionality … unless such adjudication is unavoidable.'" 2023 WL 4232309 at *8, *quoting*, *Specter Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944). "Lower courts cannot apply language that is, at heart, and unconstitutional advisory opinion." *Id*. at *18 (citation omitted).

Brooks' motion to dismiss the indictment is not foreclosed by dicta or precedent. What is equally clear, although the Government opines that the Third Circuit decision is an outlier, the issue has now caused a split in Circuits left to be resolved by the United States Supreme Court.

## Brooks is among "the people" covered by the Second Amendment

The government's argues that Brooks is not among "the people" covered by the Second Amendment, because of references to "law-abiding citizens" or "law-abiding people" in *Heller* and *Bruen*. The government is correct that a number of courts have seen fit to rewrite the Second Amendment based on this dicta.

---

[7] Accessible and downloadable at https://www.harvard-jlpp.com/wp-content/uploads/sites/21/2009/03/marshall_final.pdf.

First, the references in *Heller*, *McDonald* and *Bruen*, to "law-abiding" citizens are people were dicta as the criminal histories of the plaintiffs were not in issue. *Range*, 69 F.4th at 101. Second and more importantly, this argument elevates dicta over the Court's express holding in *Bruen*, one that requires examination of the conduct being regulated, not the status of the person performing the conduct. *Bullock* at *20, *citing* 142 S.Ct. at 2126. In *Bruen*, the Court stated: "we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." With all due respect to the courts that have concluded otherwise, the plain text of the Second Amendment applies to an individual's possession of a firearm and holding that his status as a convicted felon says otherwise is flatly disregard the Court's unambiguous statement regarding its holding in *Bruen*.

Moreover, as the *en banc* Third Circuit pointed in *Range, supra*, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." 69 F.4th at 102. The court asked rhetorically if "law-abiding" citizens excepted those "who have committed summary offenses or petty misdemeanors," noted that "today, felonies include a wide swath of crimes, some of which seem minor" and repeated the Supreme Court's recent observation that "a felon is not always more dangerous than a misdemeanant." *Id*., *quoting Lange v. California*, 141 S.Ct. 2011, 2020 (2021). In Kentucky the legislature has changed offenses from misdemeanors to felonies for the exact same conduct. A DUI 4th Offense was a misdemeanor until the 1990s when it became a felony. The failure to register as a sex offense was a misdemeanor until 2000 when it became a felony. The legislature in Kentucky has also changed felonies to misdemeanors when reviewing the amount of contraband or theft loss and increasing the threshold to become a felony. A DUI 3rd offense is a misdemeanor in Kentucky (KRS 189A.010) and a Felony in Indiana (Indiana

Code §9-30-5-3). The exact same conduct is a misdemeanor in some states while felonies in another. Consequently, assigning a status does not define a "law abiding citizen."

Finally, "the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69 F.4th at 102. Since the Supreme Court had reasoned in *Heller* "that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table," *Id*. at 103, *quoting Heller*, 554 U.S. at 636, the Third Circuit rejected such a cede of authority to a legislature "because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" 69 F.4th at 103, *quoting Folajtar v. Attorney General*, 980 F.3d 897, 912 (3d Cir. 2020)(Bibas, J., dissenting). The Bill of Rights including the Second Amendment is a bulwark insulating the people's liberties from legislative demarcation, diminution and intrusion. It would hardly make sense or be worthwhile to have a Constitutional if its scope and protections were subject to the caprice and/or transient political expediency of the legislature.

> **Neither firearm regulation by the federal government nor § 922(g) are consistent with our Nation's historical tradition of firearm regulation**

The plain text of the Second Amendment fully and directly supports Brooks' motion. The government is correct that during the ratification process a few states considered but ultimately rejected language that would have recognized the power of the federal government to limit and regulate the people's right to keep and bear arms. This leads the government to offer the unusual argument that the absence of limiting language in the Second Amendment is actually proof of the imperative that such language should be imputed to it:

> The absence of limiting proposals in the Second Amendment did not evidence a rejection of the language, but, rather reflect such a general acceptance and understanding of the limitation for keeping arms that it was unnecessary to write

an understood prohibition into the final draft of the Amendment." Govt. memo at 16.[8]

There are at least two major flaws with this argument. First, as an initial matter, drafters of a law are presumed to say what they mean and to mean what they say. *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254-54 (1992). With regard to the Constitution, "[e]very word appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood." *Holmes v. Jennison*, 39 U.S. 540, 571 (1840).

Second, at the time the Second Amendment was adopted in 1791 until well into the 20th century, the federal government was considered to lack any and all authority to regulate or limit the right to keep and bear arms. *Range*, *supra*, 69 F.4th at 106 (Porter, J., concurring). A constitutional law treatise published in 1829 offered that "[n]o clause in the Constitution could by any rule of construction be conceived to give Congress a power to disarm the people." Porter, J., concurring in *Range* at 69 F.4th at 107 *quoting* W. Rawle, A View of the Constitution of the United States of America. Indeed, the Supreme Court twice stated explicitly in decisions after the Civil War and many decades after the Second Amendment was adopted that it barred Congress from the field of firearm regulation, which was a matter for the states. *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)("The second amendment declares that [the right to keep and bear arms] shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress."); *Presser v. Illinois*, 116 U.S. 252, 265 (1886)(the Second Amendment "is a limitation only upon the power of Congress and the national government and not upon that of the states.").

The government is correct that some of the colonies and later some of the states prohibited or regulated firearm possession prior to, around and after the time the Second

---

[8] The government has long struggled with historical justifications for § 922(g). As the *Bullock* court noted, the government informed the First Circuit more than a decade ago:

> 18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified.

*Bullock*, 2023 WL at *29, *quoting* Brief of Appellee, *United States v. Pettengill*, 2011 WL 1977759 at **27-28.

Amendment was adopted. The government offers other historical examples of persons being disarmed – the English particularly singled out Catholics – but none of the examples regard a law, statute or ordinance that like § 922(g)(1) permanently disarmed someone on account of their status as a convicted felon. The government has offered similar arguments to other courts and their discussion and analysis follows.

**(a) English measures renounced by the American Revolution**

The government is correct that the English Crown and Parliament disarmed Catholics and also that the English Bill of Rights authorized Parliament to regulate firearm possession. It does not follow, however, that these facts support what would amount to a judicial re-write of the Second Amendment. First, the First Amendment prohibits the federal government from punishing or diminishing the rights of an American citizen on account, even partially, his or her religion. The *en banc* Third Circuit was dismissive of this argument for this reason. 69 F.4th at 105. Indeed, it makes no sense to acknowledge that the First Amendment prohibits the federal government from using a citizen's religion against him and then concluding that Second Amendment rights may be diminished based on religion. Historical antecedents must be "analogous" the Supreme Court advised in *Bruen* and the English practices – practices that the American Revolution was fought in large reason to break with – do not fit this bill.

Second, "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [Morton] is part of a similar group today." Id. This analogy is far too broad as the *Range* court concluded. *Id.*, *citing Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

**(b) Language limiting the Second Amendment that was considered and rejected**

The government cites to two (Pennsylvania and Massachusetts) of the state conventions to ratify the Constitution that considered but rejected language in the Second Amendment that would have authorized Congress to regulate firearm possession. Govt. memo at 15.

Samuel Adams proposed to the Massachusetts convention that only "peaceable citizens" would retain the right to bear arms. Barrett dissent in *Kanter v. Barr* at 454. Pennsylvania convention considered a proposal that those convicted of a dangerous crime and/or otherwise posing a public danger be disarmed. *Id*. at 454-55. Neither even passed the state convention; obviously, no such language made its way to the Second Amendment. Id. at 455. Furthermore, the stronger evidence goes the other way: proposals from the other states did not include any similar language of limitation or exclusion and four parallel state constitutional provisions enacted before ratification of the Second Amendment did not include any similar limitations or exclusions. *Id*. Proposals discussed but not adopted or enacted cannot establish a historical tradition of firearm regulation.

**(c)  The "virtuous citizen" theory of the Second Amendment lacks historical support**

The government next relies on what is often referred to as the "virtuous citizen" theory of the Second Amendment. Govt. memo at 17.

The "virtuous citizen" theory of the Second Amendment was dismantled by now-Justice Barrett's dismantling of the "virtuous citizen" theory in her dissent in *Kanter v. Barr*, 919 F.3d 437, 462-64 (7th Cir. 2019), which concluded: "we see no explicit criminal or even more general virtue-based, exclusion from the right to bear arms like we do in other contexts." *Id*. at 464. In reality, the "virtuous citizen" theory is merely a bit of political philosophy drawn from the classical Greek and Romans that has been misunderstood and misapplied repeatedly by courts determined to relegate the Second Amendment to second-class status.[9] This was demonstrated

---

[9] *Silvester v. Becerra*, 138 S.Ct. 945, 945, 950 (2018)(Thomas, J., dissenting from denial of certioriari)("the Second Amendment is a disfavored right in this Court" and "the lower courts are resisting this Court's decisions in *Heller* and *McDonald* and are failing to protect the Second Amendment to the same extent that they protect other constitutional rights."); *Friedman v. City of Highland Park*, 136 S.Ct. 447, 450 (2015)(Thomas & Scalia, JJ., dissenting from denial of certiorari)("I would grant certiorari to prevent the Seventh Circuit from relegating the Second Amendment to a second-class right.").

conclusively in a 2020 law journal article by J. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyoming L. Rev. 249 (2020)(Greenlee, *Historical Justification*).[10]

The wellspring of the "virtuous citizen" theory is a 1983 law review article by Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment.*[11] Greenlee, *Historical Justification* at 275. Kates' article, however, "did not argue that citizens could be disarmed merely for being unvirtuous, nor did he provide examples of any such laws." *Id*. at 276. Instead, Kates invoked "[t]he philosophical tradition embraced by the Founders regard[ing] the survival of popular government and republican institutions as wholly dependent upon the existence of a citizenry that was 'virtuous' in upholding that ancient privilege and obligation" valued in classical Greece and Rome" to keep and bear arms to defend themselves and their homes from enemies. *Id*. It appears some number of leading Americans among our nation's Founding era were enamored with classical Greece and Rome.[12] Certainly no issue is taken with these aspirations for our Nation; the point now, however, is whether they yield tangible evidence that would support defendant's prosecution. Justice Barrett's dissent in *Kanter v. Barr* demonstrates conclusively that it does not. 919 F.3d at 462-64. Judge Hardiman's concurrence in *Binderup v. Attorney General*, 836 F.3d 336, 372 (3rd Cir. 2016)(en banc), rightly labeled "contemporary insistence to the contrary [as] fall[ing] somewhere between guesswork and *ipse dixit*." The "virtuous citizen" theory does not support the government's prosecution of defendant.

>  **(d) That some felonies were subject to the death penalty or that felons were subject to estate forfeiture does not support Brooks' permanent disarmament for a non-death penalty eligible felony**

---

[10] Accessible at https://scholarship.law.uwyo.edu/cgi/viewcontent.cgi?article=1434&context=wlr.
[11] 82 Mich.L.Rev. 204 (1983); accessible at  https://repository.law.umich.edu/mlr/vol82/iss2/6/.
[12] *See Rome's Heroes and America's Founding Fathers* offered by the Journal of the American Revolution and accessible at https://allthingsliberty.com/2018/10/romes-heroes-and-americas-founding-fathers/.

The government next argues that capital punishment or estate forfeiture were imposed as punishment by the federal code and/or some states in the Founding era for felony convictions. Govt. memo at 18. Similar arguments were considered and rejected by the *en banc* Third Circuit in *Range*.

In *Range*, the *en banc* Third Circuit rejected the government's attempts to analogize those statutes to § 922(g)(1). First, the court asserted that the Founding-era punishment of "some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and tradition[,]" because "[t]he greater does not necessarily include the lesser" and it was possible for a felon to re-arm himself after serving his sentence, a situation analogous to Brooks' here. 69 F.4th at 105. Similarly, the *Range* court noted that the government had not cited a single case or statute where the felon that forfeited his estate was barred from re-arming himself. *Id*. The government has likewise failed here.

### The historical record does not distinguish between violent and non-violent felonies and Brooks' are non-violent in any event

The government argues that Brooks' felonies are violent and, therefore, he is properly subject to prosecution under § 922(g)(1). The main thrust is that Congress and other legislatures may decide whether someone is or is not a threat to public safety and disarm them permanently.

First, Brooks' conviction for aggravated drug trafficking is not a violent offense. The United States Sentencing Guidelines outlines the difference between a violent offense and a controlled substance offense. U.S.S.G. §4B1.2(a). By its omission from the enumerated offenses that are violent it is clear that drug trafficking is in the controlled substance offense category.

Second, the government fails to identify any Founding-era analog to the modern offense of failure to comply with order or signal of the police, third degree. Initially, the Sixth Circuit

recognized that crime as a crime of violence in *U.S. v Welch*, 774 F.3d 891 (6th Cir. 2014). However, that decision was vacated after the United States Supreme Court decided *United States vs. Johnson,* 135 S.Ct. 2551 (2015). It is not a crime of violence currently.

Third and finally, both the *Range* and *Bullock* courts concluded that the issue of whether the defendant's prior felony could be classified as violent or nonviolent was immaterial. There was an absence of historic evidence supporting a permanent ban regardless. *Range*, 69 F.4th at 104 n. 9; *Bullock,* 2023 WL at *31.

**§5861(d) does violate the Second Amendment**

The government first asserts that *Miller* is controlling on this issue. The jurisprudence in 1939 is much different than the cases being decided in 2023. There was not the constitutional analysis required in making decisions at that time as shown below. In interpreting *Miller* the *Heller* Court read *Miller* to say that the "Second Amendment does not protect those weapons not typically possessed by law abiding citizens for lawful purposes, such as short-barreled shotguns." However this reading misses the mark. Historically the short barreled shotgun was used for legitimate lawful purposes. In the 1920's and 1930's commercial weapons like the Ithaca "Auto and Burglar" gun being manufactured, marketed and sold.  These were pistol grip shotguns with barrels less than 18". They were legal at the time and meant for civilian defensive purposes. Approximately 2,500 were manufactured from 1921 to 1925. A double barrel version was available in 1925. *Wikipedia, Ithaca Auto and Burglar*

Furthermore, short barreled shotguns were favored by law enforcement on stage coaches. Historically the short barreled shotguns have been referred to as "coach guns". They were also utilized in mariner warfare in naval battles. The *Miller* holding is that "The Court cannot take judicial notice that a shotgun having a barrel less than 18 inches has today any reasonable

relation to the preservation or efficiency of a well regulated militia, and cannot therefore say that the Second Amendment guarantees to the citizens the right to keep and bear such a weapon." *Miller* 307 U.S. 178. The inquiry posed today is framed by a different inquiry. At that time the Court concentrated on the definition of "militia" whereas the inquiry today concentrates on "people" who can possess firearms. Consequently, Miller is not the authority the Government summarily claims.

Lastly, the Government's position is that *Bruen* did not undermine but specifically approved of licensing regimes for carrying firearms, ***for so long as those regimes are open to ordinary, law abiding citizens.*** (Government Response at pg. 30) Again this invites the inquiry of who is an ordinary law abiding citizen? The Second Amendment does not reference ordinary, law abiding citizen when using the term "people". Brooks maintains that he is one of the people but for classifying him as a felon that makes him ineligible to register. A shotgun, no matter the length of the barrel, is a firearm subject to the Second Amendment.

In a like manner the Government states "The Defendant could have easily complied with §922(g) and §5861(d) by declining to possess the firearms alleged in the Indictment." That is akin to stating that a citizen's complaint of a 4th Amendment search violation could be avoided if a citizen declined to possess illegal contraband. The ends never should justify the means in a constitutional inquiry. The entirety of this issue circles back to Brooks being a convicted felon (violent or nonviolent) being prohibited to possess or register a firearm based on his status which is unconstitutional as outlined above.

## Conclusion

For the foregoing reasons and those set forth in the Memorandum of Law Supporting Defendant's Motion to Dismiss, the Court should grant the motion to dismiss.

Respectfully submitted,

BY:  s/Steven N. Howe
STEVEN N. HOWE
507 N. Main St.
Williamstown, KY 41097
859-824-0500 (phone)
E-mail: stevenhowe@howeattorney.com
COUNSEL FOR DEFENDANT
DALTON BROOKS

## Certificate of Service

I certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to the following:  All Counsel of Record.

BY:  s/Steven N. Howe
Steven N. Howe
COUNSEL FOR DEFENDANT